**RESIDENTS OF BUCKINGHAM SPRINGS, Appellant**

v.

**BUCKS COUNTY ASSESSMENT OFFICE and Board of Assessment Appeals and Central Bucks School District.**

Commonwealth Court of Pennsylvania.

Argued Oct. 15, 2012.

Decided Jan. 14, 2013.

Joseph D. Buckley, Carlisle, for appellant.

Douglas Maloney, Langhorne, for appellee Central Bucks School District.

BEFORE: PELLEGRINI, President Judge, and SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Residents of Buckingham Springs (Taxpayers) appeal an order of the Court of Common Pleas of Bucks County (trial court) denying their tax assessment appeal. Taxpayers contend that their properties, which are manufactured houses, have been assessed too high because the real estate appraisal on which the assessment was based included the value of the land. This was improper because Taxpayers do not own the land on which these houses sit. In addition, Taxpayers contend that the judge presiding (Presiding Judge)[1] over their appeal should have recused even though they declined his offer to do so pre-trial. Concluding that Taxpayers' contentions lack merit, we affirm.

The record before the trial court on Taxpayers' challenge to their property assessment was developed primarily by stipulation of the parties. The only taxing district to participate in Taxpayers' appeal was the Central Bucks School District (School District), which did so by intervention.[2] The stipulation established the background to the instant tax appeal.

Taxpayers own 415 manufactured houses located in the Buckingham Springs Development (Buckingham Springs) in Bucks County. Buckingham Springs consists of 157 acres of land, which includes a club house, a swimming pool, and substantial open land graced by ponds and fountains. The land in the development is owned by Buckingham Village, LTD, whose general partner is McKee Management Associates, Inc., which maintains the grounds and provides security, trash removal and snow removal to residents. Taxpayers own their houses but not the lots upon which

1. The Honorable James M. McMaster presided over Taxpayers' assessment appeal.

2. Neither the County Assessment Office nor the Board of Assessment Appeals, which were parties to the appeal, participated. Buckingham Township elected not to participate. The stipulation was developed by Taxpayers and the School District.

the houses sit. Taxpayers lease their lots from McKee Management. The current monthly lease ranges from $435 to $525 per month, depending on lot size. The land in Buckingham Springs and the improvements thereon is appraised at $2,123,080.

The manufactured houses in Buckingham Springs were sited between 1991 and 1998 and purchased through McKee Management at prices ranging from $80,000 to $125,000, depending on the options chosen by the initial purchasers. The manufacturer transported each house to the site, where it was attached to a concrete foundation and connected to utilities. The purchaser's ownership of the house is recorded by means of a vehicle title issued by the Pennsylvania Department of Transportation.

Residents may sell their houses, but their purchasers must be approved by McKee Management and must agree to a one-year lease. A resident's failure to pay the rent required under the lease could result in his house being removed from Buckingham Springs, but that has never happened.

Taxpayers' houses have been assessed at values between $12,400 and $17,320, which are based upon fair market appraisals ranging from $125,000 to $180,000. Some houses in Buckingham Springs have sold for more than $180,000. Taxpayers contend that these appraisals are too high because they include the value of the lots on which their houses sit. This is improper, they argue, because Taxpayers do not own those lots. Buckingham Village, LTD is responsible for the real estate taxes on the land, and those taxes make up a part of the monthly lease payment. In effect, Taxpayers believe they are paying the same real estate tax twice. After losing their assessment appeal before the Board of Assessment, Taxpayers appealed to the

trial court for *de novo* review. The trial court took evidence to supplement the stipulation of the parties.

At the hearing before the trial court, Felix Suchora, one of the Taxpayers, testified that approximately six years ago, he paid $214,900 for his home because he liked the location and amenities available in Buckingham Springs. He testified that if he ever has to remove his house from Buckingham Springs, its value will decrease by 50%. He believes that his appraised fair market value of $152,600 should be reduced by 50%.

Another Taxpayer, Marlene Ford, testified that in 2004 she looked at several mobile home parks where the houses ranged in price from $40,000 to $100,000. She bought her home in Buckingham Springs for $187,000 because of the low density placement of the houses and the available amenities. Her home is appraised at $180,000. She opined that this appraisal is too high, noting that a similar property recently sold for $130,000.

Taxpayers also presented the expert testimony of Tracy Kemeter, the owner of a mobile home financing and sales facility. He testified that he used the National Automotive Dealers Association Manufactured Housing Cost Guide (NADA Guide), in part, to opine on the value of Taxpayers' homes.

Kemeter testified that the cost method, *i.e.*, the cost of the property, minus depreciation, plus any improvements, was the best method for appraising the value of a manufactured house. He did not believe the sales approach was appropriate because sales took into account both the value of the house and the value of the lease. Kemeter's appraisal values were much lower than the County's. In his opinion, a brand new manufactured house with square footage equal to the largest manu-

factured house in the development was worth at most $70,000. Accordingly, he opined that the appraisal values of all the properties in Buckingham Springs had been inflated by the County.

Kemeter acknowledged that the NADA Guide distinguishes between manufactured houses that constitute personal property and those used as year-round single-family dwellings. Specifically, the NADA Guide provides that a manufactured house that is not moved from an original delivery site has a physical life span similar to a site-built home; accordingly, its value is best measured by a real estate physical appraisal. The NADA Guide also provides that a manufactured house that is not moved can appreciate in value. Nevertheless, Kemeter dismissed the notion that the manufactured houses in Buckingham Springs could appreciate in value.

In response, the School District presented the expert testimony of George Sengpiel, a certified real estate appraiser. He was engaged by the School District to determine the value of Taxpayers' houses without regard to the value of the land thereunder. He considered the cost approach, comparable sales approach and the income approach. He concluded that the comparable sales approach was the best approach for valuing the properties.

Sengpiel looked at the 70 sales within Buckingham Springs that had taken place in the preceding three-year period. Sales ranged in price from $70,000 to $220,000. At the time he did his work, 34 properties were listed for sale, with asking prices ranging from $78,000 to $220,000. Sengpiel stated that value is measured by supply and demand; stated otherwise, the fair market value is what a willing buyer will pay. After examining similar developments, he determined that, had Taxpayers' properties included the house and land, they would have a market value of $275,000 to $375,000. This comparison was based on sales in an age-restricted community, with similar-sized slab homes, also located in Bucks County.

Sengpiel noted that the County's records showed that each of Taxpayers' properties had a land assessment of zero. Sengpiel explained that the location of any house will affect its fair market value; indeed, location is one of the most important elements in a valuation. This is why two identical houses in two different locations may have very different values. Sengpiel noted that Bucks County has the third highest average home sales price in Pennsylvania, in excess of $550,000. Residential properties located in Bucks County command higher prices than comparable properties in other Pennsylvania counties.

On cross-examination, Sengpiel was questioned about the fact that McKee Management could evict Taxpayers or even sell the land in Buckingham Springs as individual parcels. Sengpiel responded that until such an event occurred, one could not quantify its impact on home values in the development. In the meantime, such a possibility was too speculative to use in developing a current appraisal.

Sengpiel disagreed with Kemeter that the houses in Buckingham Springs should be valued on the basis of their manufactured price. That homes sold for $200,000 belied Kemeter's claim that the value of the home could be valued without regard to its location. This was true even where, as here, the land was not included in the real estate assessment.

The trial court accepted Sengpiel's testimony and rejected Kemeter's. First, Kemeter did not consider the location and quality of community in valuing Taxpayers' houses, even though he acknowledged that these factors affected their value. Second, the NADA Guide, on which Kemeter re-

lied, distinguished between manufactured houses used as personal property and those used as permanent single-family homes. Kemeter also ignored this distinction. The trial court credited Sengpiel's testimony, finding that his comparable sales approach established a fair market value that was consistent with the NADA Guide. The trial court denied Taxpayers' appeal.

■ Taxpayers appealed to this Court and raise three issues.[3] First, they contend that a new trial should be granted because the Presiding Judge had received campaign contributions from attorneys representing clients with an interest in the case. Second, they contend that the trial court erred in assessing the value of their properties on the basis of comparable sales instead of their cost. Third, they claim the trial court's decision violates the Uniformity Clause in the Pennsylvania Constitution. PA. CONST. art. VIII, § 1.[4]

■ We begin with Taxpayers' argument that a new trial should be granted because the Presiding Judge did not recuse from the case. In his Pennsylvania Rule of Appellate Procedure 1925(a) opinion, the Presiding Judge explained that when the case was assigned to him in July of 2011, he contacted Taxpayers' attorney, the attorney for the County, the attorney for the Township and the attorney for the School District. He learned that neither the Township nor the County intended to participate in the appeal. The opinion then explains that the Presiding Judge contacted Taxpayers' counsel, off the record, and disclosed that prior to being ap-

pointed to fill a vacancy on the court in 2010, he had been in a partnership with Craig Smith, the Township's solicitor. He also disclosed that he was running for the position of common pleas court judge and in the recent primary election had won both the Democratic and Republican primaries. Prior to the primary, his campaign committee had held two fundraisers. Craig Smith and other attorneys, who did work for the County and School District from time to time, had contributed. However, the Presiding Judge was not assigned to Taxpayers' appeal until after the primary election, at which point he was no longer actively campaigning. The Presiding Judge informed Taxpayers' counsel that he believed he could decide the case fairly, but he wanted to give Taxpayers an opportunity to request to have the case reassigned to another judge.

On the day of the hearing, the Presiding Judge again gave the parties the opportunity to object to his handling the case, explaining his prior relationship with the solicitor for the Township. He did not mention his pre-primary campaign activities. Taxpayers' attorney responded that "we have no problem with you sitting in this matter, your honor." Notes of Testimony at 5 (morning session) (N.T. ___).

In support of their recusal argument, Taxpayers note that the Presiding Judge received campaign contributions from three attorneys at the law firm representing the School District; contributions from three attorneys that work for the County; and one contribution from an attorney that works for the Township. These seven con-

---

**3.** Our standard of review in a tax assessment appeal is whether the trial court rendered a decision unsupported by the evidence, committed an error of law or abused its discretion. *Willow Valley Manor, Inc., v. Lancaster County Board of Assessment Appeals,* 810 A.2d 720, 723 (Pa.Cmwlth.2002).

**4.** It provides:

> All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under the general laws. PA. CONST. art. VIII, § 1.

tributions total $1,425.00. They charge that the Presiding Judge did not disclose these contributions during his *ex parte* conversation with Taxpayers' attorney or at any time during the trial.

■ The School District counters that once a trial is completed "a party is deemed to have waived his right to have a judge disqualified, and if he has waived that issue, he cannot be heard to complain following an unfavorable result." *Reilly v. Southeastern Pennsylvania Transportation Authority*, 507 Pa. 204, 222, 489 A.2d 1291, 1300 (1985). To preserve a legal issue for appeal, an objection must be made at trial. *Id.* It is "not enough to raise new grounds for the first time in post-trial proceedings." *Id.* at 222–23, 489 A.2d at 1300.

In *Goodheart v. Casey*, 523 Pa. 188, 199, 565 A.2d 757, 763 (1989), the Pennsylvania Supreme Court explained that "[t]he case law in this Commonwealth is clear and of long standing; it requires a party seeking recusal or disqualification to raise the objection at the earliest possible moment, or that party will suffer the consequence of being time barred." Here, Taxpayers did not raise the issue at the earliest possible moment. As noted in the Rule 1925(a) opinion, the campaign contributions in question were a matter of public record and on file with the Department of State well before the start of the hearing in this case. Taxpayers do not dispute this or provide any information about how or when they first learned of the contributions. Because Taxpayers did not raise the disqualification of the Presiding Judge until after they lost their appeal, they have waived the issue.[5]

■ In Taxpayers' second issue, they contend that the trial court erred in basing its assessment on the comparable sales method instead of the cost method, as recommended by Kemeter. They claim that common sense favors the use of the cost method and that it is improper to use comparable sales without discounting the sales price for the value of the land. The School District counters that Kemeter ignored the instructions of the NADA Guide in offering his value of Taxpayers' manu-

---

5. On the merits, Taxpayers' argument would still fail. To support recusal, Taxpayers cite cases that are distinguishable.

In *Commonwealth v. Stevenson*, 829 A.2d 701 (Pa.Super.2003), the judge informed the parties that he was under criminal investigation about presiding over future cases involving government informants. However, he denied the Commonwealth's motion for disqualification in a criminal matter involving a defendant who was a government informant. On appeal, the Superior Court found the judge had improperly denied the motion because the judge's own statement raised a doubt that he could preside impartially over government cases.

In *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), the United States Supreme Court considered whether campaign contributions can require a judge's disqualification as a matter of due process. Therein, a litigant contributed $3 million to the judge's

campaign, which exceeded by 300% the amount spent by the judge's campaign committee. *Caperton*, 556 U.S. at 884, 129 S.Ct. 2252. These contributions were made during the pendency of the litigation.

In the present case, the Presiding Judge's campaign committee received a total of $54,483.14 in contributions. The amount contributed by the three attorneys affiliated with the School District's firm totaled $450, or 0.826% of the total amount contributed. Even using the amount contributed by all seven of the complained-about contributors, *i.e.*, $1,425.00, this constitutes 2.615% of the total contributions to the presiding judge. Further, the contributions were made *before* Taxpayers' case was assigned to the Presiding Judge. Finally, the Presiding Judge stated that he could decide the case fairly, unlike the judge in *Stevenson*.

In sum, Taxpayers do not show bias, or even the appearance of bias.

factured houses. Further, the trial court, as the finder of fact, has the authority to reject Kemeter's testimony as not credible.

■ The records of the board of assessment establish the value of real properties. *Expressway 95 Business Center, LP v. Bucks County Board of Assessment*, 921 A.2d 70, 76 (Pa.Cmwlth.2007). Once this *prima facie* case is made, the burden shifts to the taxpayer to present evidence to establish another value. *Timber Trails Community Association v. County of Monroe*, 150 Pa.Cmwlth. 29, 614 A.2d 342, 345 (1992). As we have explained:

> [I]t is not enough to merely present evidence from a qualified expert. The evidence must be *sufficient* to rebut the validity of the assessment which means the evidence must be (1) believed in the sense that the trial court accepts the veracity of the expert based on, for example, his demeanor; and (2) relevant and competent in the sense that it is not dubious, but legally and factually sound so that it is of practical value to the court in its effort to arrive at the fair market value.

*Craftmaster Manufacturing, Inc. v. Bradford County Board of Assessment Appeals*, 903 A.2d 620, 627 (Pa.Cmwlth.2006) (emphasis in original). Here, the parties stipulated to the admission of the tax assessment records, which shifted the burden to Taxpayers.

Both parties relied on the NADA Guide, which provides as follows:

> While manufactured homes traditionally have remained personal property (not permanently affixed to and owned together with land), they exhibit many of the characteristics of real property. *They are year-round, single-family dwellings.*
> *They have long remaining physical life spans similar to a site built structure. More often than not, they are never moved from an original delivery site. These attributes create a valuation mode that is best measured by the time-honored real estate practice of a physical appraisal,* either in a written or narrative form or on an accepted report form.
>
> It is significant to note that without the interference of vehicle-type depreciations schedules, in most market areas manufactured homes, sited in quality communities or with land, have the ability to appreciate in terms of original purchase prices. Appreciation and depreciation is dependent on current market conditions.
>
> Many states are now taxing manufactured homes as real property when attached to fee land by an approved foundation system. Homes with this status may qualify for FHA, DVA and GSE 30-year mortgages and private secondary money markets.
>
> Once a home is sited and lived in, it becomes unique. No two homes are going to be utilized or maintained exactly alike, even if they come from the same production plant. That is why we emphasize the importance of a physical appraisal report in order to determine its local market value.

NADA Guide, 2010 ed., p. 4a (emphasis added). Taxpayers' expert dismissed the assertion that a manufactured house that never leaves its original delivery site should be appraised in accordance with "time honored real estate practice." N.T. 17 (afternoon session).

■■ As the finder of fact, the trial court makes credibility decisions and decides what weight to assign the evidence. *Appeal of Mellon Bank, N.A.*, 78 Pa. Cmwlth. 463, 467 A.2d 1201, 1202-03 (1983). The trial court's valuation of real property will be affirmed unless it is not

supported by substantial evidence. *Id.* at 1203.

Here, substantial evidence supports the trial court's valuations. The NADA Guide itself notes that manufactured houses may appreciate, and the best way to determine value is by appraisal in accordance with real estate practice. The evidence of record established that Taxpayers' houses have appreciated. Their own testimony established that they paid more than the manufactured price and that houses in Buckingham Springs continue to command these higher prices. Taxpayers' claim that these prices include the value of the land is not supported by the record. Rather, the appraised value simply reflects value added to the houses by virtue of their access to the amenities offered by Buckingham Springs, not the value of the land on which the house sits. We reject Taxpayers' argument that the appraisals on which their assessments are based are too high.

In their third issue, Taxpayers argue that the trial court's decision violates the Uniformity Clause because manufactured homes will not be uniformly valued. Rather, assessment will turn on the location, which will make land part of the value. To be uniform, they contend that the cost method of valuation must be used.

As noted by the trial court, Taxpayers have the burden of refuting the presumption of uniformity. *Fosko v. Board of Assessment Appeals, Luzerne County,* 166 Pa.Cmwlth. 393, 646 A.2d 1275, 1279 (1994). To meet this burden, Taxpayers must demonstrate that other comparable properties are assessed at a lower fair market value by

> producing evidence establishing the ratios of assessed values to market values of comparable properties based upon actual sales of comparable properties in the taxing district for a reasonable time prior to the assessment date. A taxpay-

er may also meet this burden by offering evidence of assessments of comparable properties, so long as the taxpayer also presents evidence to show that the actual fair market value of the comparable properties is different than that found by the taxing authority. However, this Court has stated that without current market value information regarding the comparable properties, the court has no basis upon which to determine the issue of uniformity. When a taxpayer fails to refute the presumed uniformity of a predetermined ratio by presenting credible, relevant and competent evidence to the contrary, the assessment of the taxing body must prevail.

*Id.* at 1279 (citations omitted).

Taxpayers' expert presented little evidence to refute the presumed uniformity. Kemeter referred to three homes in other locations, comparing them on size, make, model and year, not locations. He conceded that all of the locations were different and would affect the fair market value. His testimony just restates Taxpayers' claim that cost value is to be preferred to the sales approach. For cogent reasons already discussed, the trial court rejected Kemeter's opinion in this regard. In short, the record does not support Taxpayers' uniformity challenge.

Accordingly, the order of the trial court is affirmed.

### ORDER

AND NOW, this 14th day of January, 2013, the order of the Court of Common Pleas of Bucks County, dated October 12, 2011, in the above-captioned matter is hereby AFFIRMED.