J-A24008-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| V.P.V. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| S.V. | |
| Appellee | No. 629 WDA 2017 |

Appeal from the Order April 7, 2017
In the Court of Common Pleas of Allegheny County
Family Court at No(s): FD 15-01764-008

BEFORE:   MOULTON, J., SOLANO, J., and MUSMANNO, J.

MEMORANDUM BY MOULTON, J.:               FILED  NOVEMBER 03, 2017

V.P.V. ("Father") appeals from the April 7, 2017 order entered in the Allegheny County Court of Common Pleas following a three-day custody trial. We affirm.

The trial court set forth the factual and procedural history of this appeal in its Pennsylvania Rule of Appellate Procedure 1925(a) opinion, which we incorporate herein.  Opinion, 5/26/17, at 2-9 ("1925(a) Op.").

On April 7, 2017, the trial court issued a custody order, which included the following findings of fact:

> 1. [V.V., Jr., N.V. and D.V. ("Children")] are estranged from and alienated against [S.V. ("Mother")], despite having, in the past, told this Court that they would like their Parents to reunite.

2. The Children's positions against their Mother have strengthened over the last year and so has their defiance to authorities and adults.

3. Father has shared very adult information with the Children, including the nature of the criminal charges filed against him by Mother and the meaning of a "no contest" plea. In other matters, he has caused the children to believe that Mother is "stealing" their food stamps.

4. Father has conscripted his parents into his [w]ar against Mother, representing to them that she is a bad and abusive parent and wife, while, unbeknownst to them, he contacted Mother on numerous occasion[s], expressing his dream of being back together, as recently as the two months preceding the trial. Paternal Grandparents did not know of Father's ideas of reunification or of the covert steps he took to accomplish said reunification.

5. Paternal Grandfather and most likely Paternal Grandmother (as evidenced by her verbal attack on Mother in front of the children at Dr. [Shannon] Edwards' Office) have comported themselves in an antagonistic way toward Mother, likely on the premise that Mother is a bad Mother.

6. Mother has mishandled some of the issues that have arisen with the Children. The court finds that the most egregious incident was at school and was witnessed by the Monroeville police. No charges were filed and after hearing evidence, the Court believes there was no abuse.

7. Dr. [Neil] Rosenblum and Dr. Shannon Edwards believe that Father and Father alone holds the key to reunification between Mother and her Children, as does this Court.

8. Father failed to pay for Dr. Edwards's service, resulting in termination of important services, to the detriment of his children.

9. Father filed a series of [protection from abuse ("PFA") petitions] against Mother, purportedly on behalf of the children, all of which were filed at a time and in a manner clearly designed to thwart Mother's custody time as opposed to protect the children as purported. Of particular note, after Father agreed with Dr. Edwards to allow the children to visit with Mother on December 23, 2016, supervised by

the doctor if necessary, Father filed an [emergency] PFA, in City Court at a time when the Family Courts were closed for the holidays. The [emergency] PFA ordered no contact by mother and only permitted Mother to contact the children by phone. This prevented Mother's holiday visit from occurring. Nothing new had occurred which required the filing of an emergency PFA - the incident was the same one with the exact same evidence on which Father had based a December 9, 2016 temporary PFA filing. Father's testimony that this was an innocent action on his part and that he somehow did not realize that Mother would be prevented from being with the children at all on the Christmas holiday as a result of his actions was utterly disingenuous and this Court found said testimony to be completely incredible.

10. From the inception of this case Father has never made a genuine effort to help his children to realize the importance of a relationship with their Mother. If anything, Father has thwarted the healing of that relationship.

11. During the course of the trial in this matter, I found Father's testimony lacking in credibility and quite often belied by his out of court actions. The evidence demonstrated that Father undermined Mother's attempts to maintain a relationship with the children and pursued a course of conduct designed to alienate the children from her. Father's explanations for his actions were often contradictory and the Court found his testimony to be a transparent effort to paint himself in a good light.

12. The evidence and testimony presented convinced me that Father has engaged in a course of conduct designed to alienate the children from Mother in a misguided attempt to convince Mother to return to the marriage, intimating reunification as a pathway to Mother having access to her children. Accordingly, I have designed the following Order to allow Mother time to heal the relationship with her children and to incentivize Father to comply with the Order.

Trial Ct. Order, 4/7/17, at 2-5 ("April 7 Order").

The court then ordered, among other things, the following physical custody terms:

At the outset, I note that while it is a somewhat drastic remedy, it is my determination that if Father is not able to enforce the terms of the following shared Order, it is then in the best interests of these Children to be removed from Father's custody and control and placed with Mother if possible, and, if placing them with Mother is impossible due to their continuing refusal and or safety issues due to the Children's belligerence and/or defiance, they should be removed from Father's physical custody and be placed into foster care until it becomes possible to place them with Mother.

1. Beginning the first weekend after the date of this Order, Mother shall have a four hour supervised weekend visit at a community site of her choosing with all of the children. Father shall have a neutral person transport the children to and from the visit. A probation officer supervisor shall be [requested] by separate order, and fee shall be paid by Father in advance of the meeting.

2. Beginning May 1, 2017, Mother is to have unsupervised custody after school until 8:30 PM once a week each Child individually and in addition to the weekend community visit. It is recommended that Mother have a friend or family member present.

3. After one month of the above and beginning the first weekend she does not work, Mother is to exercise unsupervised partial custody with all three children Saturday from 9:00 a.m. to 8:00 p.m. on the alternate weekends that she does not work.

4. After two Saturday periods of custody with Mother, the parties are to resume their previous shared custody schedule on a 5-2-2-5 rotation.

5. Exchanges are to take place at the Police station closest to the marital residence. Parties are to remember that time is of the essence and should be consistent as to exchange locations and time. Being consistently late is not acceptable. The parties shall not use the Children to send verbal messages to the other parent about the custody situation or changes in the custody schedule.

b. If Father does not comply with the above stepped up plan for custody and/or the 5-2-2-5 rotation, by directing and

ensuring the children to go with Mother so she can exercise her custody time as set forth above, then sole physical and legal custody shall shift to Mother, and Father is to have no contact with Mother or the children for a period of 90 days. Upon being informed that custody exchanges are not occurring pursuant to this Order, this Court shall issue an Order implementing this paragraph to be enforced by law enforcement if necessary. The Court would support the intervention of the Office of Children, Youth, and Families to ensure the safety of the parties.

Id. at 7-9.[1] The trial court further ordered both individual and family therapy for the parties and Children. Id. at 13-15. The trial court also discussed all of the custody factors set forth in 23 Pa.C.S. § 5328 and determined that the custody order entered was in the best interests of Children. Id. at 15-20.

On April 25, 2017, Father filed a timely notice of appeal. On appeal, Father raises the following issues:

1. Whether the Trial Court erred and abused its discretion by showing an extreme and unfair prejudice against [Father], when the Court's findings are not supported by the testimony and evidence of record, is contrary to the best interest of the children and by improperly advocating on behalf of the pro-se litigant, [Mother], throughout the entire three day trial?

2. Whether the Trial Court's Order of March 28, 2017 that ultimately determined custody of the parties' three minor children after a three day trial was contrary to the best interest of the parties' three minor children and is not supported by the record?

Father's Br. at 5.

_____

[1] In its Rule 1925(a) opinion, the trial court notes Mother filed a motion alleging Father did not ensure Children's compliance with the order and, on May 22, 2017, the trial court entered an order to modify custody of Children pursuant to the April 7, 2017 order.

## I.  Advocacy/Bias by Trial Court

Father first maintains that the trial court showed "an extreme and unfair prejudice against" Father.  Father's Br. at 12.  He claims that the trial court exhibited this bias by:  advocating for Mother; disregarding the testimony of Father, his family and friends, and Children; disregarding the abuse and mental struggles of Mother; abusing its discretion when it failed to find Mother's testimony not credible; disregarding the testimony of Dr. Rosenblum; and impermissibly permitting Dr. Edwards to provide expert testimony.  Father requests that this Court (1) vacate the April 7 Order, (2) order that the trial judge recuse herself, and (3) grant a new trial to determine a custody arrangement that is in Children's best interests.  Id. at 32.

During the custody hearing, Father objected to the court's questioning of witnesses and asserted that he had a "case with the trial court" and that the trial court had made prejudgments about the case.  See, e.g., N.T., 3/1/17, at 57, 233; N.T., 3/2/17, at 254.  Father, however, did not request that the trial court recuse itself.  Accordingly, Father has waived any claim with respect to recusal.  See Lomas v. Kravitz, ___ A.3d ____, 2017 WL 4287338, at *8 (Pa. Sept. 28, 2017) ("party must seek recusal of a jurist at the earliest possible moment, i.e., when the party knows of the facts that form the basis for a motion to recuse.  If the party fails to present a motion to recuse at that time, then the party's recusal issue is time-barred and waived."); Commonwealth v. Druce, 848 A.2d 104, 108 (Pa. 2004) ("If a party questions the impartiality of a judge, the proper recourse is a motion for

recusal, requesting that the judge make an independent, self-analysis of the ability to be impartial."); Reilly by Reilly v. Southeastern Pa. Transp. Auth., 489 A.2d 1291, 1299 (Pa. 1985) ("When circumstances arise during the course of a trial raising questions of a trial judge's bias or impartiality, it is still the duty of the party, who asserts that a judge should be disqualified, to allege by petition the bias, prejudice or unfairness necessitating recusal.").

Further, even had Father not waived this claim, we would conclude that it, and any other claim based on the trial court's alleged bias, lacked merit.

We apply the following standard when reviewing recusal motions:

> [Our Supreme] Court presumes judges of this Commonwealth are "honorable, fair and competent," and, when confronted with a recusal demand, have the ability to determine whether they can rule impartially and without prejudice. Commonwealth v. White, 557 Pa. 408, 734 A.2d 374, 384 (1999). The party who asserts a trial judge must be disqualified bears the burden of producing evidence establishing bias, prejudice, or unfairness necessitating recusal, and the "decision by a judge against whom a plea of prejudice is made will not be disturbed except for an abuse of discretion." [Commonwealth v.] Darush, [501 Pa. 15, 459 A.2d 727,] 731 [(1983)].

Commonwealth v. Kearney, 92 A.3d 51, 60 (Pa.Super. 2014) (quoting Commonwealth v. Druce, 848 A.2d 104, 108 (Pa. 2004)) (some alterations in original).

Courts have noted:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair

- 7 -

judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible . . . . Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as [ ] judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

Id. at 61 (quoting Liteky v. United States, 510 U.S. 540, 555-56 (1994)) (emphasis omitted) (alterations in original).[2]

A. Advocacy

Father first argues that the trial court improperly advocated for Mother through its questioning of witnesses.

"While a trial judge should normally leave questioning of witnesses to counsel, justice may require that a trial judge ask questions when absurd, ambiguous, or frivolous testimony is given or testimony is in need of further elucidation." Commonwealth v. Carson, 913 A.2d 220, 249 (Pa. 2006). Further, we have explained:

[a] trial judge has the right if not the duty to interrogate witnesses in order to clarify a disputed issue or vague

_____

[2] As this Court noted in Kearney, our Supreme Court has "tentatively accepted the extra-judicial source doctrine, noting that it is significant if the information at the root of the recusal motion was obtained in a prior proceeding of the case, and not from any pretrial bias or personal disdain." 92 A.3d at 61 (quoting Druce, 848 A.2d at 110).

evidence. Unless the complaining party can establish the judge's questioning constituted an abuse of discretion, resulting in discernible prejudice, capricious disbelief, or prejudgment, a new trial will not be granted.

Jordan v. Jackson, 876 A.2d 443, 453-54 (Pa.Super. 2005) (quoting Mansour v. Linganna, 787 A.2d 443, 446 (Pa.Super. 2001)) (alteration in original).

The trial court found that its questioning of witnesses did not constitute improper advocacy. The trial court reasoned:

> That I questioned witnesses does not equate to advocacy. I questioned witnesses, particularly Dr. Rosenblum, when Mother, Father's counsel and Best Interest counsel did not elicit testimony which was helpful to me. Accordingly, I posed the questions necessary for me to get the facts I needed. At times my questioning, particularly of Father, was much like cross examination. It was the only avenue by which I could obtain answers to the questions I had myself which were not elicited by the litigants.
>
> Father's burden here would be to demonstrate that my questioning of witnesses during the trial constituted "an abuse of discretion, resulting in discernible prejudice, capricious disbelief, or prejudgment." Jordan[, 876 A.2d at 454]. Father cannot meet this burden. Further, there was no jury to be influenced by my questions. The weight to be given to witnesses' testimony was up to me as fact-finder.
>
> In a custody trial, my role is not to "pick a winner." It is, instead, to find what custody arrangements will best serve the interests of the Children.

1925(a) Op. at 13.

The trial court had an extensive history with this case. Not surprisingly, at the time of trial, the trial court had clarifying questions for the witnesses. Although the extent to which the trial court questioned witnesses in this case

is not typical, we conclude that here, where the trial court's task was to fashion a custody order that would be in the best interests of Children, the questioning did not result in "discernible prejudice, capricious disbelief, or prejudgment." Jordan, 876 A.2d at 454. We find no abuse of discretion.

B. Testimony of Father, Father's Witnesses, and Children

Contrary to Father's contention, the trial court did not disregard the testimony of Father, Father's witnesses, and Children. Rather, the trial court found Father not credible and found Father that influenced the testimony of Father's witnesses and Children. April 7 Order at 3, 5. The trial court explained:

> Father first argues that I am prejudiced and biased against him in a manner not supported by the evidence. I do not agree. I have been involved with this family since 2015, leading up to this trial, and so have heard Father's contradictory explanations for his actions. I have watched his Children adopt each and every one of his positions regarding Mother, positions which they could only get from Father. At trial, I found much of Father's testimony to be disingenuous, self-serving, and contradictory, and I appropriately challenged it.
>
> Although he claims that Mother is so dangerous she planned to hire a paid assassin to kill him, he also claims he is working diligently to help his Children develop a meaningful relationship with her. This is simply not a credible position. Nor is it credible when Father claims the Children's defiance is the result of genuine and justified fear of Mother, while at the same time sending her emails asking to be a family again.
>
> Father's explanation for the December 23rd [emergency] PFA was especially troubling as it demonstrated not only Father's duplicity but a purposeful effort on his part to keep Mother from the Children over the Christmas holiday, even though a perfectly safe alternative plan had been agreed to

have them meet in public with Dr. Edwards. Father's assertions that he "did not know" how the police knew Mother would be at Grandparent's house at noon on the 23rd to serve her with the PFA was, plainly, ludicrous. Equally incredible was Father's claim that he did not know the [emergency] PFA would prevent the lunch from occurring, yet he could not answer when asked how it could have occurred. Pressed, he finally admitted he knew it could not go forward.

I rightfully became impatient with Father during the trial as I did not believe he was being truthful or forthright to the court. I found disingenuous his "surprise" that his son feared Mother would kill him and that he would never forgive her. I found it impossible to believe that these boys whom Father claims will obey him in every single other circumstance of their lives nonetheless defiantly "disobey" him by not visiting with their Mother. I found his claim that he is helpless to correct that situation simply not believable.

Any impatience with Father's comportment in court is not evidence of bias. I was attempting to get to the truth of the matter and became impatient with Father's attempt to obfuscate that truth.

1925(a) Op. at 10-12 (internal citations to record omitted). The trial court's finding that Father was not credible does not establish the trial court was biased. See Kearney, 92 A.3d at 61.

C. Mother's Mental Health Issues and Issues with Children

Contrary to Father's contention, the trial court did not ignore Mother's struggles. It noted that Mother could have, and should have, handled situations differently. April 7 Order at 3; 1925(a) Op. at 5. The trial court ordered that the parties contact a Department of Human Services liaison to assist in finding family-based mental health services. The goals of this therapy "would be reunification with mother and improving that relationship,

supporting Mother in responding to the boys' fears and concerns more effectively and assisting Father to discourage the boys' aggressive, non-compliant behavior so that they can build healthy relations with their Mother." April 7 Order at 13 (emphasis added). Further, the trial court ordered Mother to "follow through with individual mental health counseling for herself to address issues of depression, trauma and stress." Id. at 14.[3]

D. Dr. Rosenblum's Testimony

Father also claims the trial court disregarded Dr. Rosenblum's testimony. We disagree.

Dr. Rosenblum prepared a report on February 28, 2016, one year before the custody hearing. N.T., 3/1/17, at 20. He had no contact with Children, Mother, or Father since preparing the report, other than to discuss fees. Id. at 23. The only substantive information Dr. Rosenblum received since preparation of the report was through discussions he had with Dr. Edwards and with the best-interest attorney, Thomas H. May, Esquire. Id.

Dr. Rosenblum testified that Father was alienating Children from Mother. Id. at 42. He recommended counseling for all parties. Id. at 27-35, 44. Dr. Rosenblum testified that he was no longer sure that the 5-2-2-5 shared custody arrangement was feasible, and agreed with Father's counsel that the end goal for custody should be left open. Id. at 48. Further, he stated that any custody order would have to be gradual. He suggested "a supported

_____

[3] The order also contained therapy requirements for Father and Children. April 7 Order at 14.

weekend visit once on Saturday or Sunday for mother and . . . the three boys."
N.T., 3/3/17, at 36. He also recommended that "each child visit with mother
separately during the school week for a period of several hours in mother's
home. That's one boy at a time." Id. at 37.

Dr. Rosenblum further stated that "[F]ather is what we call the aligned
parent, and [M]other is the alienated parent. It's only within the power of the
aligned parent to give the children psychological permission and to also
mandate to the boys their level of cooperation with these visits." Id. at 42.
He further testified:

> I'm stating multiple times that in my opinion [F]ather not
> only has the ability to make changes in the boys' perceptions
> and relationship with [M]other, but in my opinion, he should
> consider that this is in the boys' best interest. They don't
> have to have the same respect for their mother as they do
> their father. They don't have to feel that, you know – these
> are two different people and two different relationships. But
> it's not healthy for them to reject their mother to the degree
> that is going on right now.

Id. at 61. When asked what steps should be taken if Father failed to take
steps to change Children's perception of, and relationship with, Mother, Dr.
Rosenblum responded:

> Based on the age of these children, I don't recommend
> [taking Children from Father and placing them with Mother]
> because I think you would have the same warfare that you
> had when I was doing this evaluation. I do believe the Court
> might have to consider removing [C]hildren from [F]ather's
> custody and placing them either in foster care or with
> relatives if the Court believes that there is no degree of
> appropriate cooperation from [F]ather or from the aligned
> parent.

Id. at 61.[4]

The trial court considered Dr. Rosenblum's testimony in implementing a custody order that would be in Children's best interest. The custody order provided for a gradual custody schedule and included Dr. Rosenblum's suggested supervised weekend visits and individual weekday visits with

---

[4] Dr. Rosenblum acknowledged that placing Children in foster care could be viewed by Children as punishment and stated that it could cause them to close down further. N.T., 3/1/17, at 64. He clarified:

> But again, there would not be the same – if, and I'm not saying it is, but if what's coming from the aligned parent is, theoretically, hypothetically, your mother is no good, it's not healthy for you to visit with your mother, this is not a constructive relationship, and if the children feel that by identifying with [F]ather that they are sort of his minions or they are showing their loyalty to their father by doing this, that would not be constructive.

> I'm not recommending that the Court easily make a decision that we have to remove these children from their home. That's the last thing that I want. Similarly, I'm not suggesting that it's in the children's best interest to visit with their mother for a length of time or in a format that we know that right now they feel concerned about. So we have to do this gradually, and we have to do this within a framework, within a system that builds the children's confidence that mother can be a loving and nurturing parent who is supportive of their emotional needs and who can get along with them, have fun with them, and feel good about being involved in their lives. Because, yes, I am convinced that she did that in the past.

Id. at 64-65.

Mother. Further, the order provided that custody would transfer from Father

to Mother or to foster care only if Father continued to alienate Mother.[5]

E. Dr. Edwards' Testimony

Father argues that the trial court improperly considered Dr. Edwards as

an expert witness, even though he should have been permitted to testify only

_____

[5] As the trial court recognized, that part of its custody order directing that Children be transferred to foster care should Father fail to meet the terms of the order represented a "drastic step." We note that a trial court should not take such extreme steps lightly. The focus in a custody proceeding is always to determine a custody order that is in the child's best interests. A trial court must take care to ensure that efforts to reform the behavior of a recalcitrant parent do not undermine the child's best interest.

Here, despite significant efforts by the trial court and others over an extended period, Father continued to engage in conduct that alienated Children from Mother. The trial court further received testimony, including from Father's expert witness, that, if all other avenues had been tried and Father failed to reform his conduct, Children's best interest would be served by a foster care placement. Therefore, as a last resort, the trial court included a no-contact order and a change in custody. As the trial court explained:

> I entered the Custody Order in this case after long deliberation, being very aware of the drastic steps I was setting forth if the terms of the Order were not met. The . . . Order allows a gradual resumption of Mother's custody and provides counseling and time for healing. The Children deserve to return to a good relationship with their Mother. This is so important that I believe it to be an imperative, thus the consequences for not following the Order are necessary to find a way to achieve the goal, if Father cannot or will not do what he is required to do. As such, my Order serves the best interests of the Children in having the love and care of both of their parents and should be affirmed.

1925(a) Op. at 20. Accordingly, in this rare case, we conclude that the trial court did not abuse its discretion in finding that the order would be in Children's best interest.

as a fact witness.  The trial court, however, found that in reaching its decision, it considered only Dr. Edwards' "interactions with the parties and her observations" not her expert opinion.  1925(a) Op. at 15.  We discern no error.

Father references the following testimony from Dr. Edwards:

> [Dr. Edwards]:   .  .  .  In cases such as this, complete reprogramming has to happen.  I'm not as suggestive as my colleague, Doctor Rosenblum's, whereas I would say I would issue a no contact, 90 days.  It's time sensitive in this particular –
>
> [Father's Counsel]:  Objection, Your Honor.  I understand your ruling and she can continue with the objection on the record.
>
> [The Court]:  So what is it that put you over the edge in terms of saying that the children need not to be near him?  Because he says they are doing this because of what she did.  Why do you think that that's not the case?
>
> [Dr. Edwards]:  We have had, when I say we, I say the system, the court system has had several professionals be hired, testify, or write reports to suggest otherwise.  There has been misuse of the system.  With regard to PFAs, we do have people that are victims, severe domestic violence who abuse sexually and physically their children who do need PFAs, and do need those resources very badly.  And there have been many PFAs filed in this case that have not been substantiated by evidence.  I find that to be very offensive to the system and our judicial system.
>
> I say what puts this over the edge is that.  I say what puts this over the edge is the fact that these children need both of their parents.  They need their mother and their father.  And there has been no evidence to suggest that physical or sexual abuse has been founded, despite several [Children, Youth and Families] cases being open and closed in the matter.  I also suggest that there have been licensed professionals, such as myself and Doctor Rosenblum, who have evaluated and/or seen them in therapeutic situations who have suggested that there are other issues at hand.  However, it is not a case of one or both parents abusing the

- 16 -

children.  Although some in my field may argue that parental alienation is abuse of a child.

N.T., 3/1/17, at 184-85 (emphasis added).

Dr. Edwards' testimony at times appeared to go beyond mere fact witness testimony, and she did mention a 90-day no-contact order.  Father's expert, Dr. Rosenblum, however, also testified that, if Father refused to help end the alienation of Mother, a period of time where Father did not have custody was warranted.[6]  There is no indication the trial court relied on Dr. Edwards' recommendation in reaching her decision.

F. Mother's Credibility

Father claims the trial court erred in failing to find Mother's testimony not credible.  The trial court found that the impeachment evidence presented by Father was not dispositive of the custody determinations.  1925(a) Op. at 17.  As the trial court's credibility determinations are supported by the record, we will not disturb them on appeal.  See M.J.M. v. M.L.G., 63 A.3d 331, 337 (Pa.Super. 2013).

II.  Best Interest of Children

Father next contends that the trial court "failed to apply [the custody factors] in a manner that truly was reflective of the best interests of the children's general well being."  Father's Br. at 24.  He claims the trial court

_____

[6] We further note that Father's proposed custody order required a 90-day period where Mother had no contact with Children.  Plaintiff's Amended Proposed Objection, Proposed Custody Order and Proposed Finding of Fact at 3-4.

- 17 -

abused its discretion by failing to consider Mother's "lies and abuses" and by finding the majority of factors weight in Mother's favor.

Our standard of review in child custody cases is as follows:

> Our paramount concern and the polestar of our analysis in this case, and a legion of prior custody cases is the best interests of the child. The best interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being. On appeal, our scope of review is broad in that we are not bound by deductions and inferences drawn by the trial court from the facts found, nor are we required to accept findings which are wholly without support in the record. On the other hand, our broad scope of review does not authorize us to nullify the fact-finding function of the trial court in order to substitute our judgment for that of the trial court. Rather, we are bound by findings supported in the record, and may reject conclusions drawn by the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.
>
> Further, on the issues of credibility and weight of the evidence, we defer to the findings on the trial judge. Additionally, appellate interference is allowed only where it is found that the custody order is manifestly unreasonable as shown by the evidence of record.

Saintz v. Rinker, 902 A.2d 509, 512 (Pa.Super. 2006) (quoting Arnold v. Arnold, 847 A.2d 674, 677 (Pa.Super.2004)).

Here, in reaching its custody order, the trial court analyzed the factors set forth in 23 Pa.C.S. § 5328.  See April 7 Order at 15-20.  The record supports the trial court's factual findings and credibility determinations. Father's arguments effectively asks us to disregard these credibility

determinations and re-weigh the facts, which we will not do.  See Saintz, 902

A.2d at 512.

Further, the trial court explained:

> Dr. Rosenblum testified that removing Children from the aligned parent is no longer considered appropriate by experts in parental alienation.  My order does not remove the Children from Father.  Instead, it gives Father the time and incentive to alter his behavior and convince the Children that he wants them to see their Mother.  Only if Father refuses will such drastic measures be introduced.
>
> Dr. Rosenblum testified as to his recommendation which were substantially similar to my Order.  Dr. Rosenblum also testified that as a last resort, if Father did not cooperate, he would suggest putting the Children in foster care.
>
> I do not find Father's proposed solution for a 90 days "cooling off" period where the Children have no face-to-face contact with Mother, to be in their best interest.  To the contrary, I believe it would send the message to the Children that they and Father have won the war they instituted against Mother and would only serve to cement their defiance.
>
> I strongly feel that the best way to help the Children improve their relationship with Mother is through therapy in which Father genuinely participates and through time with their Mother which Father genuinely encourages.  As noted by both professionals who testified in this case, the key is with Father, who has the ability to make the change.  Dr. Rosenblum stated that Father needs to do a "better job of instructing the boys that it is not only necessary for them to visit but desirable for them to visit and I do believe that Father has the ability and the authority and the rapport with the boys that he should be able to be successful."  It is Father who must take the steps to demonstrate to the boys that giving their Mother a chance is not just a Court Order, but it is the right thing to do and that he supports it.

1925(a) Op. at 19-20. We conclude that the trial court did not abuse its discretion concluding that the custody order was in Children's best interest.[7]

Order affirmed.

Judge Musmanno joins the memorandum.

Judge Solano files a concurring statement.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/3/2017

_____

[7] We note that, as is often the case in child custody actions, it appears that subsequent events occurred following the appeal. At argument, this Court was informed that the parties' eldest son was in foster care. We note, however, that we cannot consider this information in deciding this appeal, and, as discussed above, the trial court's decision to include in its order a provision allowing such a situation was not an abuse of discretion.