J-A12018-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE:  ESTATE OF BERNICE L. SHUMAN, DECEASED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: MIFFLINTOWN NEW LIFE ASSEMBLY OF GOD, A/K/A NEW LIFE ASSEMBLY OF GOD CHURCH | : : : : : : | No. 1178 MDA 2020 |

Appeal from the Order Entered August 28, 2020
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  2218-0667

BEFORE:  LAZARUS, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY LAZARUS, J.:            **FILED: DECEMBER 30, 2021**

Mifflintown New Life Assembly of God, a/k/a New Life Assembly of God Church ("New Life"), appeals from the order, entered in the Court of Common Pleas of Dauphin County, Orphans' Court Division, declaring that a certain certificate of deposit owned by Bernice L. Shuman, Deceased ("Decedent"), belonged to Decedent's residuary estate, of which Appellee, Humane Society of Harrisburg Area, Inc. ("Humane Society"), is the beneficiary.  After our review, we reverse and remand.

The following factual and procedural history is gleaned from the findings of fact issued by the Honorable John McNally, III, as well as the certified record.  Decedent died testate on July 4, 2018.  Under the terms of her will, Decedent appointed Juniata Valley Bank of Mifflintown ("Executor") as executor; letters testamentary were duly granted by the Register of Wills of Dauphin County on July 27, 2018.  In the course of marshalling the assets of

the Decedent's estate, Executor was advised by Pennian Bank, f/k/a First National Bank of Mifflintown ("Bank"), of numerous accounts held by Decedent at the Bank. Among these accounts was a certificate of deposit with an account number ending in 8643 ("CD") in the amount of $100,000. Bank informed Executor that New Life was designated as beneficiary of the CD. However, when the Decedent's copy of the CD was located among her belongings, the account ownership type was marked as "individual," and the space allowed for a beneficiary designation was left empty. The beneficiary designation was indicated only on an internal computer system used by the Bank for account maintenance; no document evidenced that Decedent ever requested or authorized this change in beneficiary designation.

As a result of the conflicting information provided by the Bank regarding the account designations, Executor was "reluctant to determine whether the [CD] constituted an *inter vivos* gift to [New Life] or whether [it was] part of the residuary estate" under Decedent's will. Petition for Declaratory Judgment, 2/15/19, at ¶ 7. Accordingly, after advising all interested parties of the issue, Executor filed a petition for declaratory judgment requesting that the court issue an order directing distribution of the funds. Following discovery and an evidentiary hearing, the Orphans' Court issued findings of fact and conclusions of law on August 28, 2020, determining that: (1) the CD is neither a "joint account," "trust account," nor "multiple-party account" as defined by the Multiple-Party Account Act ("MPAA"), 20 Pa.C.S.A. §§ 6301-6306, and therefore New Life's rights in the CD are not governed by the MPAA;

(2) the CD was not a transfer on death account held in beneficial form under the Transfer on Death Security Registration Act ("TOD Act"), 20 Pa.C.S.A. §§ 6401-6413; and (3) there was no evidence that Decedent intended to create a revocable trust pursuant to the Uniform Trust Act ("UTA"), 20 Pa.C.S.A. §§ 7701-7799.3. Accordingly, the court ordered that the CD be distributed in accordance with the residuary clause of Decedent's will.

New Life filed a timely appeal to this Court on September 10, 2020. On October 7, 2020, the Orphans' Court granted New Life's application for stay pending appeal. New Life raises the following claims for our review:

1. Whether the [Orphans' Court] erred in holding that[,] although New Life [] was added as a beneficiary to [the CD] by [Bank], the [MPAA] did not apply; and that the [Orphans' Court] erred in not shifting the burden of proof onto the Humane Society [] to require "clear and convincing evidence of a contrary intent" for the court to overturn the Bank's beneficiary designation.

2. Whether the [Orphans' Court] erred in not holding that a [T]otten [T]rust was created, although New Life [] was added as a beneficiary to the [CD] by the [B]ank.

3. Whether the [Orphans' Court] erred in not holding that the "Portfolio/Account File Maintenance Request Form" initialed by Tammi Wentzler was competent evidence of Decedent's intent and the Bank's consent to make New Life [] the beneficiary of the [CD].

4. Whether the [Orphans' Court] erred in holding that[,] although New Life [] was added as a beneficiary to [the CD] by the Bank, the Transfer on Death Security Regulation Act, 20 Pa.C.S.A. § 6401, did not apply.[1]

---

[1] As its name suggests, the TOD Act applies to "securities." The term "security," as used in the statute, is derived from section 8-102 of the Uniform Commercial Code ("UCC"), *see* 20 Pa.C.S.A. § 6401, Uniform Law Comment,
*(Footnote Continued Next Page)*

- 3 -

Brief of Appellant, at 15-18 (citations to record omitted).

Prior to addressing New Life's substantive claims, we must resolve an issue raised by New Life in an application for relief filed in this Court. On March 1, 2021, New Life filed a "Motion to Supplement the Record or in the Alternative Remand for a New Trial," in which it alleged that Judge McNally

---

and is defined as follows: "A share, participation[,] or other interest in property, in a business or in an obligation of an enterprise or other issuer. The term also includes a certificated security, an uncertificated security[,] and a security account." 20 Pa.C.S.A. § 6401. Section 8-102 of the UCC, in turn, defines "security" as follows:

> (15) "Security," except as otherwise provided in Section 8-103, means an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer:
>
>> (i) which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer;
>>
>> (ii) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and
>>
>> (iii) which:
>>
>>> (A) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or
>>> (B) is a medium for investment and by its terms expressly provides that it is a security governed by this Article.

Uniform Commercial Code § 8-102 (Definitions).

Based on the foregoing definitions, it is clear that traditional consumer depository accounts such as the CD at issue in this matter are not "securities" and are, therefore, not governed by the TOD Act. Accordingly, New Life's argument under the TOD Act is misplaced and we need address it no further.

failed to disclose his personal relationship with the Humane Society, as required under the Pennsylvania Code of Judicial Conduct, 207 PA. Code § 2.7, thus denying New Life the opportunity to request his recusal before trial. Specifically, New Life alleged that:

> Shortly after filing [New Life's] brief, counsel for [New Life] discovered information that Judge [McNally] had and may still have a relationship with [the] Humane Society that should have been disclosed to all parties. Materials included with the attached Affidavit state that Judge McNally had been a board member and solicitor for nine (9) years for [the] Humane Society, and that as recent[ly] as 2017, Judge McNally was a member, through contributions and/or volunteering, of [the] Humane Society.

Application for Relief, 3/1/21, at [2]. New Life attached to its application for relief the following documents: (1) an affidavit of New Life's counsel, David A. York, Esquire, averring that Attorney York discovered Judge McNally's alleged conflict on January 21, 2021, the day after he filed New Life's brief and reproduced record; (2) a Pennsylvania Family Council voter's guide questionnaire completed by Judge McNally, dated May 4, 2017, listing the Humane Society of Harrisburg as one of the five organizations in which he was "most involved as a member, through contributions, and/or through volunteering"; (3) an undated "candidate profile" in which Judge McNally indicated that he was a board member and solicitor for the Humane Society for nine years; (4) an undated online "Vote Smart" biography noting Judge McNally's membership in the Humane Society of Harrisburg; (5) a January 10, 2017 online article from "PennLive" entitled "Lower Paxton attorney enters race for Dauphin County Court," reporting then-Attorney McNally's

announcement of his candidacy for common pleas court and noting his membership on the board of the Humane Society; (6) a January 26, 2021 letter from Attorney York to George W. Porter, Esquire, counsel for the Humane Society, requesting that Attorney Porter "conduct an inquiry of [the Humane Society] concerning any relationship that [the Humane Society] has now or had in the past with Judge McNally" and disclose that information to Attorney York and his client; (7) an email response from Attorney Porter advising Attorney York that "[a]ccording to what I have learned, to the best of my knowledge, Judge McNally has not served on the board of the Humane Society or acted as solicitor during the past fifteen years;" and (8) follow-up correspondence from Attorney York requesting clarification as to Judge McNally's status as a member of the Humane Society as of mid-2017. **See** Motion to Supplement Record, 3/1/21, at Exhibits A-H.

On March 12, 2021, the Humane Society filed a response to New Life's motion, asserting that "if Judge McNally . . . believe[d] that his impartiality was in any way affected by his prior service to the Humane Society[,] he would have either disqualified himself or recused himself from the proceedings." Answer to Motion to Supplement Record, 3/12/21, at [3]. Given the passage of time since his involvement with the organization, the Humane Society argued that "it was reasonable for Judge McNally to conclude that his past involvement with [the organization] was not a relationship that was reasonably necessary to disclose prior to the hearing[.]" **Id.** The Humane Society attached to its answer a verified statement from its executive director,

- 6 -

Amy B. Naunas, stating that, during the 15 years that she has been in that position, Judge McNally "has not served as a solicitor, board member, volunteer[,] or pro bono attorney." Verified Statement of Amy B. Kaunas, at ¶ III.

On May 3, 2021, we granted New Life's request to supplement the record and directed the parties to submit supplemental briefs addressing the recusal issue. In its supplemental brief, New Life argues that (1) it preserved the issue of recusal for appellate review because it raised it "at the earliest possible moment after discovering the underlying facts relevant to recusal," Supplemental Brief of Appellant, at 6, and (2) Judge McNally should have disclosed his affiliation with the Humane Society because it raises the appearance of impropriety.

In support of its position, New Life cites to the Code of Judicial Conduct Rule 2.7—and specifically, Comment 3 thereto—which states: "A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification or recusal, even if the judge believes there is no proper basis for disqualification or recusal." 207 Pa. Code § 2.7, Comment 3. New Life argues that "[i]t is unimaginable that any person **might** not find information that a judge was a board member and solicitor for nine (9) years for an opposing party and a recent member of an opposing party through contributions and/or volunteering, **reasonably relevant** to a **possible**

motion for recusal." Supplemental Brief of Appellant, at 14 (emphasis in original).

New Life also refers to Formal Advisory Opinion 2015-4, issued by the Judicial Ethics Committee of the Pennsylvania Conference of State Trial Judges, which addresses, *inter alia*, "When and What Should a Judge Disclose?" New Life directs our attention to two specific examples it deems relevant here: (1) "A judge should disclose facts regarding the judge's ***current or former association or relationship with a party***, a lawyer, or a witness"; and (2) "A judge should disclose that he or she ***provided legal services to a party*** or witness prior to taking the bench." Supplemental Brief of Appellant, at 15, quoting Formal Advisory Opinion 2015-4 (emphasis added by Appellant).

New Life argues that, because Judge McNally had an obligation to disclose his past association with the Humane Society, a "reasonable litigant" would not only question his impartiality, but would be "shocked" by his failure to disclose. Supplemental Brief of Appellant, at 16. Accordingly, New Life believes it is entitled to a new trial. We disagree.

"[T]he Code of Judicial Conduct does not have the force of substantive law, but imposes standards of conduct upon the judiciary to be referred to by a judge in his self-assessment of whether he should volunteer to recuse from a matter pending before him." ***Reilly by Reilly v. Southeastern Pennsylvania Transp. Auth.***, 489 A.2d 1291, 1298 (Pa. 1985), *overruled on other grounds* as recognized by ***Gallagher v. Harleysville Mut.***, 617 A.2d

- 8 -

790, 794 (Pa. Super. 1992). Our Supreme Court has made clear that "[t]he rules do not give standing to others, including [the] Superior Court, to seek compliance or enforcement of the Code because its provisions merely set a norm of conduct for our judges and do not impose substantive legal duties on them." *Id.* The Court has comprehensively set forth the law and procedure in addressing violations of the Code, as well as petitions for recusal, as follows:

Perceived violations of [the] Code do not permit the trial courts or the intermediate appellate courts to alter the rules of law, evidentiary rules, presumptions[,] or burdens of proof. More importantly, violations of [the Code are] not a proper subject for consideration of the lower courts to impose punishment for attorney or judicial misconduct. The Constitution provides a mechanism for the enforcement of violations of the Code of Judicial Conduct and the Judicial Inquiry and Review Board is authorized, on its own volition, where necessary, to investigate violations of the Code[.] Upon the Board's findings and determinations recommending disciplinary action for violations of the Code, the matter is referred to [the Pennsylvania Supreme Court]. [The Supreme Court] then review[s] the record and may wholly accept or reject the recommendation as [it] find[s] just and proper. This procedure, except for impeachment proceedings, is the exclusive mode established for the discipline of our judges for violations of the Code and [the Supreme Court has] not abdicated or delegated any of [its] supervisory authority in enforcing these standards of conduct to [the] Superior Court. To presume that the Code or its alleged violations can be reviewed by any tribunal other that those [authorized by the Pennsylvania Supreme Court] is a misapprehension of the purpose of the Code, and is seen as an impermissible meddling into the administrative and supervisory functions of [the Supreme Court] over the entire judiciary.

When circumstances arise during the course of a trial raising questions of a trial judge's bias or impartiality, it is still the duty of the party, who asserts that a judge should be disqualified, to allege by petition the bias, prejudice[,] or unfairness necessitating recusal. A failure to produce a sufficient plea will result in a denial of the recusal motion.

* * *

The proper practice on a plea of prejudice is to address an application by petition to the judge before whom the proceedings are being tried. He may determine the question in the first instance, and ordinarily his disposition of it will not be disturbed unless there is an abuse of discretion.

* * *

It is incumbent upon the proponent of a disqualification motion to allege facts tending to show bias, interest[,] or other disqualifying events, and it is the duty of the judge to decide whether he feels he can hear and dispose of the case fairly and without prejudice because we recognize that our judges are honorable, fair[,] and competent. Once this decision is made, it is final and the cause must proceed. The propriety of this decision is grounded in abuse of discretion and is preserved as any other assignment of error, should the objecting party find it necessary to appeal following the conclusion of the cause.

**If the cause is appealed, the record is before the appellate court[,] which can determine whether a fair and impartial trial were had. If so, the alleged disqualifying factors of the trial judge become moot**.

*Reilly by Reilly*, 489 A.2d at 1299-1300 (citations omitted; emphasis added).

Although there are no statutory or rule-based procedures for recusal in

Pennsylvania,

the law is clear. In this Commonwealth, a party must seek recusal of a jurist at the earliest possible moment, *i.e.*, when the party knows of the facts that form the basis for a motion to recuse. If the party fails to present a motion to recuse at that time, then the party's recusal issue is time-barred and waived.

*Lomas v. Kravitz*, 170 A.3d 380, 390 (Pa. 2017).

Further, a trial judge's failure to *sua sponte* raise the issue of his own

impartiality

does not entitle a party to question a judge's partiality after the case has ended **without substantiation in the record that the**

> **complaining party did not receive a full, fair[,] and impartial trial**.

> * * *

> The failure to preserve an issue on appeal will be excused only when a strong public interest outweighs the need to protect the judicial system from improperly preserved issues.

> **Additionally, as in other cases involving after[-]discovered evidence, there must be a showing that: (1) the evidence could not have been brought to the attention of the trial court in the exercise of due diligence, and (2) [] the existence of the evidence would have compelled a different result in the case**.

*Reilly by Reilly*, 489 A.2d at 1300-01 (citations omitted) (emphasis added).

Here, New Life has failed to aver, much less demonstrate, that it did not receive a full, fair, and impartial trial. *See id.* Indeed, our independent review of the record reveals no bias or partiality on Judge McNally's part. Moreover, New Life does not explain why it could not have discovered Judge McNally's past affiliation with the Humane Society through the exercise of due diligence prior to trial. It is apparent that counsel discovered Judge McNally's involvement with the Humane Society through a simple internet search in January 2021. However, the information uncovered had been available for years.[2] The fact that counsel waited to perform an internet search for Judge McNally until after the court ruled against his client suggests little more than

---

[2] Two of the four internet printouts submitted in conjunction with New Life's application for relief are undated. Two printouts, from PennLive and the Family Council, are dated 2017. The undated "Candidate Profile" relates to Judge McNally's candidacy for the State Senate, which—according to the PennLive article—occurred in 2012.

an *ex post facto* attempt to obtain a better result for his client. ***See id.*** at 1300 ("Because every case cannot be subjected to the unlimited questioning of the trial judge's impartiality, a line must be drawn as to when the impartiality can be challenged and we draw that line at the entry of the verdict, as qualified hereinafter.").

In light of the foregoing, we are constrained to conclude that New Life is not entitled to a new trial as a result of Judge McNally's failure to disclose his affiliation with the Humane Society.[3]  We now turn to New Life's substantive appellate claims.

New Life first claims that the court erred in concluding that the MPAA did not apply—despite finding that New Life was added as a beneficiary to the CD by the Bank—and by not shifting the burden of proof to the Humane Society to prove contrary intent on the part of Decedent.  New Life argues that the MPAA does not require an account holder to submit a written order to change the form of the account.  Accordingly, New Life argues, the court erred in placing the burden of proof on New Life to demonstrate that Decedent requested, in writing, the addition of a beneficiary.  Essentially, New Life asserts that the form of account reflected in the bank's records is dispositive,

_____

[3] We note, however, that the best practice is for a jurist to disclose information of this type in order to avoid any appearance of impropriety and to enable litigants to make a timely and informed decision regarding the appropriateness of a recusal motion.

unless the Humane Society proves, by clear and convincing evidence, a different intent on the part of the Decedent.  We agree.

The MPAA governs multiple-party accounts, which it defines as "either a joint account or a trust account."  20 Pa.C.S.A. § 6301.  The MPAA defines a "trust account," in relevant part, as follows:

> [A]n account in the name of one or more parties as trustee for one or more beneficiaries where the relationship is established by the form of the account and the deposit agreement with the financial institution and there is no subject of the trust other than the sum on deposit in the account; it is not essential that payment to the beneficiary be mentioned in the deposit agreement.

*Id.*

Our Supreme Court has stated:

In order that financial institutions have the certainty and regularity required for the general course of human commerce, the General Assembly enacted . . . the MPAA.  Rather than allowing certain property to be subject to the protracted resolution of family disputes, as illustrated by the conflict between Appellant and Appellee, the General Assembly established that **joint accounts enjoy the presumption of a right of survivorship, absent "clear and convincing evidence" of a contrary intent**.  "Clear and convincing evidence" requires:

> [that t]he witnesses must be found to be credible[;] that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order[;] and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.  It is not necessary that the evidence be uncontradicted[,] provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

*In re Novosielski*, 992 A.2d 89, 106–07 (Pa. 2010) (internal citations and footnotes omitted) (emphasis added).  As set forth in section 6304(b) of the MPAA, this presumption likewise applies to trust accounts:

> (b) Trust account.--At the death of the trustee or the survivor of two or more trustees, **any sum remaining on deposit belongs to the person or persons named as beneficiaries**, if surviving, or to the survivor or survivors of them if one or more die before the trustee or last surviving trustee, **unless there is clear and convincing evidence of a contrary intent**[.]

20 Pa.C.S.A. § 6304(b) (emphasis added).

Here, the records of the bank at the time of Decedent's death reflected a beneficiary designation in favor of New Life.[4]  As such, the account was

---

[4] While there is no written proof that Decedent requested this designation, there is likewise no proof that the designation was mistakenly or fraudulently altered.  In any event, no writing was necessary.  "Absent a finding based on clear and convincing evidence that the account was fraudulently created, or accomplished through a breach of trust . . ., the lower courts [are] simply required to apply the MPAA[.]" *In re Novosielski*, 992 A.2d at 107.  Section 6305 of the MPAA provides that "[t]he applicability of the provisions of section 6304 (relating to right of survivorship) **is determined by the form of account at the death of the party**."  20 Pa.C.S.A. § 6305 (emphasis added).  Section 6305 is derived from section 6-105 of the Uniform Probate Code, which provides as follows:

> The provisions of [s]ection 6-104 as to rights of survivorship are determined by the form of the account at the death of a party. **This form may be altered by written order given by a party to the financial institution to change the form of the account or to stop or vary payment under the terms of the account.  The order or request must be signed by a party, received by the financial institution during the party's lifetime, and not countermanded by other written order of the same party during his lifetime**.

*(Footnote Continued Next Page)*

subject to the MPAA's presumption that, absent clear and convincing evidence of contrary intent, the sum remaining on deposit belonged to New Life at Decedent's death.[5]   However, the trial court failed to apply the proper

_____

Uniform Probate Code § 6-105 (emphasis added).  In enacting section 6305, the Pennsylvania Legislature chose to omit the highlighted language requiring that a change in account form be initiated by written order of the account holder.  "[W]here a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent." *Fletcher v. Pennsylvania Prop. & Cas. Ins. Guar. Ass'n*, 985 A.2d 678, 684 (Pa.  2009).  Accordingly, we must conclude that the legislature did not intend that an account holder be required to submit a written order when requesting a change in the form of an account.

[5] The parties deposed Nanci Aumiller, a security officer at Bank.  She testified that, on June 17, 2015, a portfolio account maintenance request was entered by then-employee Tammi Wetzler into Bank's computer system, requesting that New Life be added as a beneficiary to the CD.  *See* N.T. Aumiller Deposition, 2/28/20, at 61-62, 65.  That request would have been forwarded to a computer operator, who would then make the change to the account in the system.  *See id.* at 65.  Aumiller testified that the account maintenance request was stamped by a computer operator—"GRG 374"—on June 17, 2015, indicating that the change to the account had been made on that date.  *See id.  See also* Portfolio/Account Maintenance Request, 6/17/15.  Aumiller further testified as follows:

> Q:  Concerning this particular instruction, ["]Please add New Life Assembly of God [C]hurch as beneficiary on this [CD,"] is there any record that [Bank] questioned this instruction?
>
> A:  There is not.
>
> Q:   What would be the process . . . if [Bank] did question the instruction?
>
> A:  It's possible that there would be an e-mail sent to Tammi or a phone call to Tammi.  No e-mails were found.  I mean[,] I can search for them.

*(Footnote Continued Next Page)*

presumption by requiring the Humane Society to prove, by clear and convincing evidence, that Decedent did not intend the addition of New Life as beneficiary of the CD. Rather, the court placed the burden on New Life to prove that Decedent added New Life as a beneficiary. *See* Findings of Fact, at ¶ 35 ("There was no evidence produced either via deposition, through discovery[,] or during the hearing that Decedent ever requested[,] either orally or in writing[,] that a beneficiary be added to [the CD]."). This was in

---

> Q: And so the computer printout that describes [New Life] as beneficiary is reflective of this instruction on the form?
>
> A: That's correct.
>
> Q: And this form was signed by an employee?
>
> A: That's correct.
>
> Q: And her—this, again, was Tammi—Tammi Wetzler?
>
> A: Correct.
>
> Q: And you would agree that this form, at least as the bank took it, modified the signature card?
>
> A: That's correct.
>
> . . .
>
> Q: And would you agree that [Bank] gave written consent[, in accordance with the deposit agreement,] to add a beneficiary and to transfer a survivorship right or to make a change in ownership when an employee signs the instruction . . . and it was entered in to the computer?
>
> A: Yes.

*Id.* at 66-68.

We note with some curiosity that none of the parties deposed or presented in-court testimony from Tammi Wetzler, the former employee who actually submitted the account change request.

error.  As the MPAA makes clear, sums remaining on deposit at the death of the account owner belong to the named beneficiaries, absent clear and convincing evidence to the contrary.  Because the "form of account" at Decedent's death reflected a beneficiary designation in favor of New Life, the burden of proof was properly on the Humane Society to prove otherwise.

Here, the sole evidence of contrary intent offered by the Humane Society was that, during consultations with her attorney related to the preparation of her estate plan, Decedent did not mention that New Life was the beneficiary of the CD.  **See** Brief of Appellee, at 30.  However, the Humane Society also concedes that counsel did not inquire as to whether Decedent had named a beneficiary on any of her accounts.  **See id.**  The Humane Society also notes that Decedent never informed her trust officer and attorney-in-fact, Cynthia Williams, that New Life had been named as beneficiary.  However, Decedent's failure to advise either her attorney or attorney-in-fact of a change in beneficiary designation does not amount to clear and convincing evidence that Decedent did not, in fact, make such a change.  As noted above, the MPAA does not require a written order by a depositor to change the form of an account, and the Humane Society has proffered neither clear and convincing evidence of contrary intent, nor evidence of fraud.  **See In re Novosielski**, **supra**.  Accordingly, we reverse the order of the Orphans' Court

- 17 -

declaring that the CD be included in the Decedent's residuary estate and direct the entry of an order declaring New Life to be the beneficiary of the account.[6]

Order reversed. Case remanded with instructions. Jurisdiction relinquished.

Judge Musmanno joins this Memorandum.

Judge Stabile concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/30/2021

---

[6] Because we conclude that the Orphans' Court erred by failing to apply the MPAA and the burden of proof attendant thereto and grant New Life the relief it seeks, we need not address its remaining claims.